## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATIONAL FIRE AND MARINE** | : | **CIVIL ACTION** |
| **INSURANCE COMPANY** | : | |
| | : | |
| **v.** | : | **NO. 22-1500** |
| | : | |
| **GENESIS HEALTHCARE, INC.** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                        **November 16, 2022**

The COVID-19 pandemic beginning here in early 2020 permeated our businesses, schools, and health care facilities. We are not aware of an immune population. Businesses, including nursing homes, established procedures to mitigate the risk but we are not aware, before an early 2021 vaccine, of steps which significantly impaired the spread of COVID-19 in a closed facility.

Genesis Healthcare, Inc. owns hundreds of companies which individually own and manage nursing homes and health care facilities. Thousands of nursing home residents, like many persons not in nursing homes, contracted COVID-19 in 2020. Genesis claims to have adopted largely undisclosed protocols to mitigate the spread of COVID-19 in the facilities managed by its operating companies. But its alleged protocols did not stop residents from contracting COVID-19. Genesis's operating companies, as well as Genesis to a lesser extent, faced twenty-three lawsuits and twenty pre-suit notices from residents who contracted COVID-19 during 2020. The claims vary. But the parties adduce no evidence of more than one resident claiming the operating companies violated one identified Genesis protocol or more than one resident citing a specific Genesis protocol would have stopped COVID-19. Claims differ by how the operating company attempted to mitigate COVID-19 in the facility it owned and managed.

Genesis purchased insurance coverage for the 2020 policy year to pay for its losses above a $3,000,000 self-insured retention which it incurred in defending and satisfying a claim arising from a single health care event. Genesis sought coverage in December 2021 for losses above $3,000,000 by characterizing all the COVID-19 lawsuits and claims in the 2020 policy year as one claim. Genesis argues the residents' claims arising from COVID-19 is a single health care event and it need only exhaust one $3,000,000 self-insured retention in defending and satisfying all the claims. Genesis spent approximately $1.3 million as of the close of discovery six weeks ago. It expects to spend another $300,000 in the next five months.

The insurer sued Genesis asking us to declare its coverage obligations begin after Genesis incurs more than $3,000,000 on each of the separate health care events depending on where and how the resident contracted COVID-19. Both Genesis and its insurer ask us to decide, before Genesis incurs $3,000,000 in losses, whether the COVID-19 injuries in the forty-three claims arise from one health care event for purposes of defined terms in the insurance policy or the defense costs and settlements in the variety of contexts should be considered separate health care events.

We find the case or controversy is justiciable even though Genesis has not yet exhausted one-half of the $3,000,000 self-insured retention. We also find the claims connected with the operating companies' COVID-19 responses do not constitute one health care event as defined by the insurance policies purchased by Genesis given the wide variety of facts and attributed causes in the forty-three claims arising so far during the 2020 Policy period. The great variety of alleged conduct is not the same or related acts or omissions as defined in the purchased insurance policy. We grant the insurer's Motion for summary judgment and deny Genesis' Motion for summary judgment.

## I.    Undisputed material facts[1]

Genesis Healthcare, Inc. owns approximately 400 companies which provide health care services.[2] Each of the companies operates a long-term care and/or a nursing home facility.[3] Genesis does not operate the facilities.[4] It owns the membership or shareholder interests in each of the approximately 400 operating companies.

### *Genesis purchases insurance from National Fire in place during 2020 COVID-19.*

Genesis purchased a senior care liability insurance policy for it and its operating companies from National Fire and Marine Insurance Company for the policy period December 1, 2019 to December 1, 2020 (the Primary Policy).[5] National Fire, under the defined terms of the Primary Policy, agreed to provide Genesis and its operating companies with claims-made and reported professional liability and general liability coverage.[6] Genesis also purchased an excess senior care liability insurance policy from National Fire for the same period (the Excess Policy).[7] Genesis is listed as the first named insured and its operating companies are additional named insureds.[8]

National Fire, consistent with the Primary Policy, will pay all loss and claims expenses on behalf of Genesis subject to a self-insured retention and up to its limits of liability arising from a "health care event."[9] National Fire's Primary Policy confirms all claims and potential claims for damages arising out of, or in connection with the same "health care event" are deemed to have been made on the date the first claim is made against Genesis, or the date Genesis discovers the first potential claim, whichever date is earlier.[10]

National Fire and Genesis agreed to define a "health care event" as "any *event* in the rendering of, or failure to render, *professional services* that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing professional services shall be considered one health care event."[11] An "event" is defined as "an accident."[12]

3

"All injuries arising out of, or in connection with: (1) the same or related acts or omissions; or (2) the continuous or repeated exposure to substantially the same harmful conditions; will be considered one event."[13] "Professional services" include "treatment[s]" such as medical, surgical, dental, mental health, and nursing services.[14]

But coverage does not begin with dollar one. Genesis and National Fire agreed to "Self-Insured Retentions" where National Fire is not responsible to pay for losses until Genesis incurs expenses more than:

- $3,000,000 per event for all locations except Kentucky;
- $5,000,000 per event for all Kentucky locations; and
- $160,000,000 aggregate for all locations.[15]

Genesis is responsible for defending claims or potential claims until it exhausts its self-insured retentions.[16] After Genesis exhausts the $3,000,000 self-insured retention "per event" (or $5,000,000 if the event occurred in Kentucky), then National Fire is obligated to assume Genesis's defenses in the underlying lawsuits, claims, and potential claims.

The Excess Policy provides excess professional liability coverage on a claims-made and reported basis in the amount of $20,000,000 per event and $20,000,000 in the aggregate for losses in excess of the coverage under the Primary Policy's limits.[17] The Excess Policy does not contain a separate self-insured retention (as it has been exhausted through the Primary Policy terms). The Excess Policy contains the same definition of a "health care event" as the Primary Policy.[18]

### Genesis's response to the COVID-19 pandemic.

The United States Secretary of Health and Human Services declared a national public health emergency regarding COVID-19 on January 13, 2020.[19] The Centers for Medicare and Medicaid Services and the Centers for Disease Control and Prevention issued guidance and directives to nursing homes on how to operate during the COVID-19 pandemic.[20] Genesis, guided

by these directives, created a coronavirus response team to implement protocols for its operating companies to respond to COVID-19.[21] Genesis's Deputy General Counsel Susan Overton swore the Genesis response team's protocols tried to prevent residents from contracting COVID-19 and included "many aspects of how to care for and treat and assess patients at the bedside."[22] Genesis developed these alleged internal protocols for use "across the organization."[23] The protocols seemingly generally addressed "all aspects of nursing home operations" including protocols related to: visiting the nursing homes; allowing non-essential personnel's ability to access the nursing homes; scheduling communal activities in the nursing homes; screening and testing for COVID-19; using personal protective equipment; communicating COVID-19 cases to residents, family members, and governmental agencies; and grouping residents.[24]  Residents still contracted COVID-19 and some became severely ill and died.[25]

### *Genesis notifies National Fire of potential COVID-19 claims.*

About 12,000 residents contracted COVID-19 in the facilities owned and managed by the operating companies in the nine months after the United States declared a national public health emergency.[26] Genesis sent National Fire's appointed agent MedPro Group a letter on September 21, 2020 giving "notice of circumstances related to the COVID-19 pandemic which could give rise to a claim."[27] Genesis stated "Genesis' Professional Liability policies may be implicated if residents and/or their families seek to criticize Genesis' policies, procedures, and actions taken during the pandemic."[28] Genesis also added "on a precautionary basis" how its reporting of these incidents or potential claims "could potentially be batched under the Professional Liability coverage part and considered a single health care event subject to a single retention, to the extent that Genesis's acts or omissions in providing professional services in response to conditions created by COVID-19 that resulted in injury to two or more residents are deemed related claims

and potential claims."[29] Genesis attached a list of residents who had contracted COVID-19 since March 2020 and bolded the name of people who had sued Genesis or sent a notice of their intent to sue.[30]

Genesis sent supplemental notice letters to MedPro on October 29, 2020 and November 30, 2020.[31] Genesis, through these supplemental letters, continued to provide additional information to MedPro about new COVID-19 cases, claims, and lawsuits at various Genesis facilities.[32] Genesis attached a spreadsheet to its November 30, 2020 letter listing 21,999 people who tested positive for COVID-19 at Genesis facilities and 2,639 people Genesis "presumed" tested positive.[33]

Genesis assumed responsibility for defending the initial COVID-19 claims and lawsuits from around the country because they easily fell within the $3 million self-insured retention on the Primary Policy.[34]

### National Fire considers the COVID-19 claims in multiple locations as one event in 2020.

National Fire's agent MedPro's Senior Underwriter Denise Gibson-Terry replied to an email from Genesis on June 22, 2020 – *before* Genesis sent its first notice of COVID claims and lawsuits – confirming "[t]he [self-insured retention] on the policy is $3M per Event so even if there are multiple locations involved in one Event, the [self-insured retention] is $3M per Event."[35] Less than a month after receiving Genesis's first notice of COVID-19 related claims, National Fire, through MedPro, shared with Genesis its "coordinated COVID-19 National Defense Plan" in October 2020.[36] MedPro informed Genesis it intended to actively monitor the currently pending COVID-19 lawsuits.[37]

MedPro informed Genesis it planned to watch the COVID-19 cases almost five months later "a little more closely than we otherwise would" "[b]ecause all the COVID cases have only 1

[self-insured retention]."[38] MedPro again referenced "the sole [self-insured retention] on the Genesis COVID claims" and the need to "keep closer tabs on those pending claims that remain in pre-suit stage" in an email to Genesis on December 16, 2020.[39]

### *National Fire changes its position in January 2021.*

MedPro, on behalf of National Fire, sent a reservation of rights letter to Genesis on January 20, 2021 advising, among other things, "COVID-19 Incidents and any COVID-19 Claims for any resident at a location may constitute one health care event triggering the Primary Policy per event liability limit . . .  MedPro does not currently conclude that there is one health care event for all locations . . . MedPro currently concludes that for each location at least one per event self-insured retention exists."[40] MedPro continued, "the COVID-19 Incidents and COVID-19 Claims all involve the same general failure to keep persons, whether residents, employees, or business invites, free from the COVID-19 virus at one of several insured's locations[.]"[41]

Genesis sent supplemental notices on COVID-19 cases, claims, and lawsuits to MedPro on March 1, May 5, July 8, and December 22, 2021.[42] Genesis's last letter also provided "specific notice of this claim as the loss reserves are set at $4,840,281.75 which is 50% or higher of the retention."[43]

MedPro sent Genesis a supplemental reservation of rights letter on March 8, 2022.[44] MedPro wrote it maintains "for each location there is at least one per event self-insured retention" and "all claims and potential claims arising from the reported COVID-19 Incidents are not subject to a single per event self-insured retention."[45] MedPro further asserted "it is possible that claims and potential claims arising at the same location could arise from more than one health care event, and a single health care event may be limited to COVID-19 Incidents that occurred within 45-days of another COVID-19 Incident at the same location."[46]

MedPro assigned claim numbers and a separate event number to incoming lawsuits and claims.[47] But it gave the same event number to related lawsuits and claims.[48] MedPro's Jeffrey Gerson swore MedPro first assigned two claims involving COVID-related incidents at *different* facilities the *same* event number by mistake.[49] Mr. Gerson explained two COVID-related claims at different facilities would be considered "different events" because they occurred at "different facilities."[50]

### The parties sue each other asking we declare when undisputed coverage begins.

National Fire preemptively sued Genesis six weeks after its final reservation of rights letter.[51] National Fire asks we declare (1) the underlying lawsuits and pre-suit claims and potential claims arise from *multiple* heath care events and Genesis must satisfy a self-insured retention for each health care event before National Fire is obligated to provide coverage for the underlying lawsuits and pre-suit claims and potential claims; and (2) only those underlying lawsuits, pre-suit claims and potential claims or future claims involving the same health care event as those claims or potential claims first reported to National Fire before the December 1, 2020 expiration of the Primary Policy will be considered a claim made or a potential claim discovered during the policy period of the Primary Policy.[52]

Genesis countersued National Fire and asks us to declare: (1) the known lawsuits, claims, and potential claims constitute *one* health care event, and (2) the lawsuits, claims and potential claims Genesis reported to National Fire after December 1, 2020 shall be deemed to have been first made as of September 21, 2020, and such claims arise out of, or in connection with the same "health care event[.]"[53] Genesis also asks us to award money damages, pre- and post-judgment interest, actual damages in an amount to be proven at trial, costs of suit, attorney's fees, and such other and further relief we deem just and proper.[54]

The parties engaged in extensive discovery. Genesis paid $996,726.30 in claims expenses and $329,000 in loss in the claims and potential claims by the discovery close six weeks ago. Genesis's counsel represented at oral argument it expects to expend another approximate $300,000 over the next six months. Genesis contends their expense to date is subject to a single $3 million self-insured retention.[55]

## II.   Operating companies and Genesis face lawsuits and claims after COVID-19.

The question today is whether residents' complaints and pre-suit claims against the facilities – which Genesis considers a "Covid batch" because they involve the operating company's and Genesis's responses to COVID-19 – constitute a single health event under the Primary Policy. We are not reviewing whether the merits of the underlying claims or whether Genesis correctly evaluates the potential loss from each known claim. Counsel adduced each claim to show a nexus to the self-described COVID-19 batch and to invoke our limited jurisdiction as we do not have a ripe controversy between National Fire and Genesis until we find sufficient evidence Genesis incurred or is likely to incur more than $3 million in losses. We group our analysis into three groups based on the known lawsuits, claims, and the thousands of COVID-positive tests.

### *Twenty-three lawsuits.*

We first need to understand the nature of lawsuits twenty-nine residents filed against Genesis and/or the operating companies which Genesis contends are related to COVID-19.[56] Twelve of the twenty-nine complaints do not assert a claim based on the resident contracting COVID-19 because of a failure to prevent COVID-19 exposures or properly treat residents with COVID-19.[57] These complaints allege non-COVID-19 related injuries such as those arising from falls, pressure sores, ulcers, and skin breakdowns. But Genesis still claims some nexus to COVID-19 by citing facts in National Fire and Genesis's internal files demonstrating all residents named

in the known lawsuits – regardless of whether they pleaded COVID-related claims or injuries – tested positive for COVID-19 at some point.[58] So, Genesis includes everyone who contracted COVID-19 even if they have not referenced COVID-19 in their complaint.

Of these twenty-nine lawsuits, Genesis voluntarily removed six lawsuits from its COVID-19 batch after the parties in those suits notified Genesis or its operating company they would not be pursuing COVID-related claims.[59] Twenty-three known lawsuits remain in Genesis's COVID-19 batch. At least two of these lawsuits have settled.[60] Eleven of the known lawsuits sue *only* the individual Genesis facility where the resident resided. Nine of these lawsuits sue both Genesis and the facility managed by the operating company where the resident resided. Three lawsuits sue only Genesis but reference the operating company's facility in the complaint.

The twenty-three remaining known lawsuits include six lawsuits which do not allege COVID-related injuries and do not reference a COVID-19 policy:[61]

| Case name | Underlying claims/facts |
|---|---|
| *Donald Henry v. Genesis Healthcare Corporation, Brier Oak on Sunset, LLC, et al.*[62] | Mr. Henry sues Genesis and the Brier Oak facility alleging elder abuse and negligent hiring and supervision related to pressure sores at the Brier Oak Sunset facility located in Los Angeles, California. |
| *Estate of Pearl Parks v. Harborside Connecticut Limited Partnership d/b/a Arden House*[63] | Ms. Parks's estate sues the Arden House for negligence related to a fall resulting in head and shoulder injury at the Arden House in Hamden, Connecticut. Staff at the Arden House placed Ms. Parks in isolation after she contracted COVID and allegedly failed to properly monitor her while in isolation. |
| *Myra Reis v. 84 Cold Hill Road Operations, LLC d/b/a Holly Manor Center*[64] | Ms. Reis sues the Holly Manor Center in Mendham, New Jersey for multiple counts of negligence after staff ignored her calls for help and she fell and broke her hip. The fall occurred during "the height of the COVID-19 pandemic." |
| *Estate of Joel D. Busch v. Peter Stivali, R.N. et al.*[65] | Mr. Busch's estate sues Genesis "d/b/a Keene Center" in Cheshire, New Hampshire, and various staff members at the Keene Center for negligence arising from skin breakdowns and pressure wounds on his legs. |

| | |
|---|---|
| *Estate of Deborah Rojas v. 12080 Bellaire Way Operations LLC d/b/a Elms Haven Center, et al.*[66] | Ms. Rojas's estate sues Genesis and the Elms Haven Center in Thornton, Colorado for negligence and wrongful death related to Ms. Roja's bed sores, weight loss, and malnutrition. Ms. Rojas suffered complications from COVID-19 while a resident at Elms Haven Center. Her cause of death is listed as adult failure to thrive and multiple chronic wounds. |
| *Estate of Lydia Hampton v. 22 East Lindsley Road Operations LLC d/b/a Arbor Glen Center, et al.*[67] | Ms. Hampton's estate sues the Arbor Glen Center in Cedar Grove, New Jersey for negligence and wrongful death claiming the staff negligently provided safety measures for the prevention of pressure wounds causing Ms. Hampton to develop pressure ulcers and infections, which led to her death. |

Seventeen of the remaining known lawsuits allege COVID-related injuries. Seven of these seventeen lawsuits claim the Milford Center in Delaware failed to maintain proper policies and protocols to prevent the spread of COVID-19 at the facility. Two of the lawsuits claim the St. Joseph Transitional Rehabilitation Center in Nevada did not, among other things, properly segregate patients with COVID-19 at the facility. The other eight cases allege eight separate operating companies caused the resident or their family members to contract COVID-19.

These seventeen lawsuits include:

| Case name | Underlying claims/facts |
|---|---|
| *Estate of Jannis Vaughan v. Genesis Healthcare, Inc., et al.*[68] | Mr. Vaughan's estate sues Genesis and the Milford Center in Milford, Delaware for negligence, wrongful death, and survival claims for allowing Mr. Vaughan to contract COVID-19. Mr. Vaughn's death certificate lists pneumonitis and COVID-19 as his causes of death. Mr. Vaughan's estate claims, among other things, the Milford Center co-mingled presumptively positive residents with asymptomatic residents, allowed employees at the Milford Center to improperly use personal protective equipment, housed up to four residents in one room, and failed to maintain proper policies and procedures for COVID-19.<br><br>On April 22, 2020, the Department of Health and Human Services issued the Milford Center a violation report indicating "[w]hile the facility maintains an infection prevention and control program they failed to adhere to and implement standard and transmission based precautions to prevent the spread of infection [COVID-19] there by jeopardizing the safety and well fare [sic] of residents." |

| | |
|---|---|
| *Estate of Maryanna Morra v. 700 Marvel Road Operations, LLC, et al.*[69] | The estate of Ms. Morra sues Genesis and the Milford Center for claims of negligence and wrongful death relating to Ms. Morra contracting COVID-19 at the Milford Center. The estate claims the Milford Center failed to properly screen visitors, staff, and patients for COVID-19, failed to properly isolate patients, and failed to timely refer a patient to a higher level of care when needed. |
| *Estate of Shirley Laird v. 700 Marvel Road Operations, LLC, Genesis Operations, LLC, et al.*[70] | The estate of Ms. Laird sues Genesis and the Milford Center and other Genesis entities for negligence and wrongful death. The estate claims the Milford Center failed to prevent Ms. Laird from falling on multiple occasions. Ms. Laird's death certificate lists her immediate cause of death as COVID-19. |
| *Estate of Deloria Young v. Genesis Healthcare, Inc.*[71] | The estate of Ms. Young sues Genesis "A/K/A Milford Center" for negligence and wrongful death at the Milford Center. The estate claims staff at the Milford Center failed to prevent Ms. Young from falling on multiple occasions. The estate also claims the Milford Center co-mingled presumptively positive residents with asymptomatic residents, allowed employees at the Milford Center to improperly use personal protective equipment, housed up to four residents in one room, and failed to maintain proper policies and procedures for COVID-19. Ms. Young's death certificate lists COVID-19 as one of her causes of death. |
| *Estate of Evelyn Cornelson v. 700 Marvel Road Operations, LLC d/b/a Milford Center*[72] | The estate of Ms. Cornelson sues the Milford Center for negligence and wrongful death related to Ms. Cornelson contracting pressure sores and COVID-19. The estate claims the Milford Center failed to maintain proper policies for patients susceptible to COVID-19 and failed to have sufficient personal protective equipment to protect residents. Ms. Cornelson's death certificate lists COVID-19 as one of her causes of death. |
| *Estate of Edward Hudson v. 700 Marvel Road Operations, LLC d/b/a Milford Center*[73] | The estate of Mr. Hudson sues the Milford Center for negligence and wrongful death. The estate claims staff at the Milford Center failed to prevent Mr. Hudson from falling on multiple occasions. Mr. Hudson died as a result of contracting COVID-19. The estate claims the Milford Center failed to maintain proper policies for patients susceptible to COVID-19 such as screening and cleaning procedures and failed to have sufficient personal protective equipment to protect residents. |

| | |
|---|---|
| *Estate of Marian Santo v. Genesis Healthcare, Inc.*[74] | The estate of Ms. Santo sues Genesis "A/K/A Milford Center" for medical malpractice and wrongful death related to Ms. Santo contracting COVID-19. Ms. Santo's estate claims, among other things, the Milford Center co-mingled presumptively positive residents with asymptomatic residents, allowed employees at the Milford Center to improperly use personal protective equipment, housed up to four residents in one room, and failed to maintain proper policies and procedures for COVID-19. |
| *Joan Ossowski v. St. Joseph Transitional Rehabilitation Center*[75] | Ms. Ossowski sues the St. Joseph Transitional Rehabilitation Center in Las Vegas, Nevada for claims of negligence related to contracting COVID-19. She claims St. Joseph Transitional Rehabilitation Center put another patient who had symptoms of COVID-19 in her room when she did not have symptoms. |
| *Estate of Joseph Soto v. St. Joseph Rehabilitation Center*[76] | Mr. Soto's estate sues the St. Joseph Transitional Rehabilitation Center in Las Vegas, Nevada for claims of negligence related to contracting COVID-19. The estate claims the center did not properly sanitize, segregate patients, or test for COVID-19. Mr. Soto eventually contracted COVID-19 and died. |
| *Carol Wayne and Melissa Maynell v. 329 Exempla Circle Operations, LLC d/b/a PowerBack Rehabilitation Lafayette*[77] | Mr. Wayne's wife and daughter sue the PowerBack facility located in Lafayette, Colorado for negligent infliction of emotional distress and negligence *per se* when PowerBack discharged Mr. Wayne from the facility but failed to inform his family he had been exposed to COVID-19. |
| *Estate of Robert Blessing, et al. v. 4927 Voorhees Road*[78] | The estate of Mr. Blessing sues the Orchard Ridge facility located in Florida for wrongful death. Mr. Blessing's death certificate lists COVID-19 as a cause of death. The estate claims Orchard Ridge's employees failed to, among other things, provide Mr. Blessing with adequate supervision, prevent unexpected injuries, and supervise and train staff. |
| *Estate of Roberta Daniels, et al. v. The Earlwood, LLC and Spring Senior Assisted Living*[79] | The estate of Ms. Daniels sues Spring Senior Assisted Living and the Earlwood Center for claims of elder abuse and wrongful death. Ms. Daniels died shortly after contacting COVID-19. The estate claims the two facilities failed to adequately care for Ms. Daniels. |

| | |
|---|---|
| *Estate of Norma Olaso v. Alexandria Care Center, LLC d/b/a Genesis Healthcare, et al.*[80] | Ms. Olaso's estate sues the Alexandria Care Center in Torrance, California for claims of elder abuse/neglect, negligence, and wrongful death related to COVID-19. The estate claims the Alexandria Care Center failed to provide the care and fulltime assistance Ms. Olaso required. The estate also claims on May 15, 2020, the Alexandria Care Center reported ninety-one cases of COVID-19 among residents and staff which resulted in employees not showing up for work. Ms. Olaso died shortly after contracting COVID-19 at the Alexandria Care Center. |
| *Estate of Helen Centola v. Genesis Healthcare, Inc., et al.*[81] | Ms. Centola's estate sues Genesis and the Victoria Manor Nursing Home in New Jersey alleging negligence and wrongful death from contracting COVID-19. The estate claims the Victoria Manor Nursing Home did not provide staff or patients with personal protective equipment – such as masks, gowns, and eyewear – and even discouraged or prohibited the use of masks until late March 2020. The estate also claims the nursing home failed to test patients who developed COVID-19 symptoms and failed to isolate individuals who were exposed to COVID-positive individuals. |
| *Estate of Maxine Velarde, et. al. v. Board of Regents of the University of New Mexico, et al.*[82] | The estate of Ms. Velarde sues Genesis, the Sandia Ridge Center, and other entities alleging claims for medical malpractice, negligence, wrongful death, and loss of consortium related to Ms. Velarde contracting COVID-19 at the Sandia Ridge Center in New Mexico and giving it to her family. The estate claims Sandia Ridge Center did not have protocols to prevent COVID-19 including proper COVID-19 testing. Ms. Verlade's death certificate lists "COVID-19 pneumonia" as the cause of death. Ms. Verlade's husband died from COVID-19 shortly after contracting it from Ms. Velarde. |
| *Estate of Lois Brubaker, et. al. v. Hamilton Arms Center OPCO, LLC, et al.*[83] | The estate of Ms. Brubaker served a writ of summons seeking medical records from Hamilton Arms Center located in Pennsylvania likely because of Ms. Brubaker contracting COVID-19. |
| *Estate of Carmen Bejar Figueroa, et al. v. Anaheim Terrace Care Center and Genesis Healthcare, LLC*[84] | The estate of Ms. Figueroa sues the Anaheim Terrace Care Center in Orange County, California and Genesis alleging negligence and wrongful death claims stemming from Ms. Figueroa contracting COVID-19. The estate claims the Anaheim Terrace Care Center failed to implement effective infection control policies, ignored the state's legal requirement for infection control prevention, failed to enforce social distancing among residents, fail to restrict visitors, and failed to screen for COVID-19. |

Genesis notified National Fire of one its known lawsuits – *Estate of Carmen Bejar Figueroa, et al. vs. Anaheim Terrace Care Center and Genesis Healthcare, LLC* – on July 13, 2021.[85] Ms. Figueroa contracted COVID-19 while a resident of the Anaheim Terrace Care Center and died in August 2020.[86] On July 27, 2021, MedPro sent a letter partially denying insurance coverage in the *Figueroa* matter for its alleged COVID-19 related claims stating "MedPro must decline to provide any insured with a defense and/or indemnity for the allegations pertaining to COVID-19" because the claims are excluded by the COVID-19 and pandemic disease exclusion endorsement.[87]

### *Twenty claims not in suit.*

Our next group is twenty claims not in suit.[88] These pre-suit claims stem from Genesis and/or one of its operating companies either receiving a monetary demand by a resident or resident's family member or a notice of a potential future lawsuit.[89] Six of these claims lack information the residents contracted COVID-19 as a result of Genesis's failure to prevent COVID-19 exposures or properly treat residents with COVID-19.[90] But Genesis points to facts in National Fire and Genesis's files demonstrating the residents named in the claims all contracted COVID-19 at some point.[91] So, Genesis again assumes these six claimants are COVID-related even though the residents have not complained of any COVID-related injuries:

| Claimant | Underlying claims/facts[92] |
|---|---|
| C.B.[93] | C.B. suffered an injury from a fall at the Arden House in Hamden, Connecticut. |
| R.B.[94] | R.B contracted COVID-19 and had a feeding tube inserted before being discharged to the Fairland Center in Pennsylvania. While at the Fairland Center, the feeding tube dislodged, and staff reinserted it. A few weeks later, he developed a serious infection from the feeding tube and died shortly after. |
| I.S.[95] | I.S. suffered injuries from multiple falls at the Crestwood Center and the Ridgewood Center both located in New Hampshire. |
| S.E.[96] | S.E. missed dialysis treatments at the Lafayette Center in New Hampshire. |

| F.C.[97] | F.C. died because of an ambulance collision while a resident at the Everett Center located in Everett, Washington. |
| D.A.V.[98] | D.A.V. developed sepsis at the Cranbury Center in Monroe, New Jersey. |

The fourteen remaining claims allege COVID-related injuries. Two claims involve residents contacting COVID-19 at the Arden House in Connecticut. The remaining twelve claims all involve separate Genesis facilities:

| Claimant | Underlying claims/facts |
|---|---|
| L.L.[99] | L.L. contracted COVID-19 while a resident at the Arden House in Connecticut. |
| H.A.[100] | H.A. contracted COVID-19 at the Arden House in Connecticut. She also suffered ulcers and bed sores. H.A.'s estate claims the facility failed to establish a proper COVID-19 control plan and failed to screen staff and other residents. |
| B.H.[101] | B.H. contracted COVID-19 at the La Estancia Nursing and Rehabilitation Center. B.H. claims staff at the facility did not wear proper personal protective equipment and did not give her medicine on time. |
| J.Q.[102] | J.Q. contracted COVID-19 at the Brier Oak on Sunset facility in California and died. J.Q.'s estate claims the facility failed to follow proper procedures and protocols to safeguard J.Q. |
| W.R.[103] | W.R. contracted COVID-19 at the Woodland Care Center in California and died. W.R.'s estate claims the Woodland Care Center did not properly control COVID-19 outbreaks, failed to provide basic care to W.R., and understaffed the center to maximize profits. |
| C.A.[104] | C.A. died at the Kimberly Hall Health Center due to the center's alleged "neglect and negligent supervision." C.A.'s death certificate lists COVID-19 as a cause of death. |
| I.G.[105] | I.G. seeks medical records from the St. Joseph's Center located in Connecticut. |
| S.W.[106] | S.W. contracted COVID-19 and died while a resident at the Loch Raven facility in Bedford, New Hampshire. |
| E.L.[107] | E.L. contracted COVID-19 and died while a resident at the Bedford Hills facility in New Hampshire. |
| E.P.[108] | E.P. contracted COVID-19 and died while a resident of the Mercerville Center in Hamilton Township, New Jersey. |
| O.C.[109] | O.C. contracted COVID-19 while a resident of the Millville Center in Millville, New Jersey. |
| D.M.R.[110] | D.M.R. contracted COVID-19 and died while a resident of the Voorhees Center located in Voorhees, New Jersey. D.M.R.'s estate claims negligence and abuse against the Voorhees Center. |

| D.C.[111] | D.C.'s contracted COVID-19 and died while a resident at Brandywine Hall located in West Chester, Pennsylvania. The estate claims wrongful death against the facility. |
| M.B.[112] | M.B. contracted COVID-19 and died while a resident at the Chapel Manor Nursing Home in Philadelphia, Pennsylvania. The estate alleges the Chapel Manor Nursing Home did not follow proper COVID-19 protocols. |

***Thousands of residents who contracted COVID-19 in 2020.***

Third, Genesis provided notice to National Fire of potential claims by identifying thousands of individual residents who contracted COVID-19 at facilities owned and managed by the operating companies.[113]

## III.    Analysis

The parties cross-move for summary judgment arguing there are no genuine issues of material fact and we can determine the issues as a matter of law.[114] National Fire asks us to declare (1) the underlying COVID-19 lawsuits, claims and potential claims arise from a separate health care event at each Genesis location, and (2) the policies in effect from December 1, 2019 to December 1, 2020 do not provide coverage for claims or potential claims reported to National Fire after December 1, 2020.[115] National Fire argues the COVID-19 claims involve multiple health care events because they involve "different, and separately insured, Genesis subsidiaries, at thirty-eight different insured locations, spanning thirteen states, for different alleged acts or omissions, causing injuries to residents at different points in time."[116] As National Fire interprets the policies, Genesis must satisfy a separate $3 million self-insured retention for each health care event at each, separate location before National Fire is obligated to pay above the self-insured retention.[117]

Genesis asks we declare the opposite: (1) the COVID-19 claims against Genesis constitute a single health care event, with a single self-insured retention, under the plain language the of

policies, and (2) all claims against Genesis by or on behalf of residents who contracted COVID-19 relate back to the first notice Genesis provided, even if there are no allegations about COVID-19 in the residents' demand letters or complaints.[118] Genesis contends the Primary and Excess Policies language "plainly requires the grouping of all COVID-related claims against Genesis as a single health care event" because the claims "arise from whether or not Genesis engaged in measures sufficient to protect its residents from contracting COVID-19."[119]

### A.      The underlying COVID-related lawsuits and claims.

National Fire contends the underlying COVID-19 lawsuits and claims constitute multiple health care events. Genesis asserts the COVID-19 lawsuits and claims constitute a single health care event. National Fire evaluates the facts of the known lawsuits and claims and concludes the different personnel and disparate conditions in the thirty-two operating facilities led to the claims.[120] Genesis urges us not to look at the underlying allegations and instead contends all the claims arise "from whether or not Genesis engaged in measures sufficient to protect its resident from contracting COVID-19."[121] Genesis argues, even if we look at the underlying allegations of the COVID-19 claims, the alleged COVID-19 injuries all arise from protocols and procedures Genesis developed for its operating companies to protect its residents.[122]

The underlying lawsuits and claims against Genesis and its subsidiaries are not identical. These forty-three known lawsuits and claims involve thirty-two different Genesis-owned operating facilities locations in thirteen states: Arizona, California, Colorado, Connecticut, Delaware, Florida, Maryland, Nevada, New Hampshire, New Jersey, New Mexico, Pennsylvania, and Washington.[123]

The residents allege significantly different types of injuries in different geographic regions at different times from a variety of sources. We cannot ignore the different types of injuries alleged.

Twelve of the known lawsuits and claims allege injuries arising from causes unrelated to COVID-19, including pressure sores, ulcers, falls, skin breakdowns, and even an ambulance collision.

The residents in the known lawsuits also sue different operating companies. Of the twenty-three known lawsuits remaining in Genesis's self-described COVID-19 batch, eleven lawsuits sue *only* the individual operating company managing the facility where the resident resided; nine sue both Genesis and the operating company managing the facility where the resident resided; and three lawsuits sue only Genesis.

The thirty-one known lawsuits and claims alleging COVID-related injuries involve separate Genesis operating companies being sued for differing conduct in different states. The underlying facts of the lawsuits and claims show the residents contracted COVID-19 from different sources. For example, the seven lawsuits against the Milford Center in Delaware allege the operating company failed to maintain proper policies and protocols to prevent the spread of COVID-19 inside this facility which caused the residents to contract COVID-19. But the resident in the *Velarde* matter claims the "Sandia Ridge Center did not have in place protocols designed to prevent the infection and spread of COVID between November 12 and November 23, 2020" which led Ms. Velarde to contract COVID-19 and give it her family.[124] And the resident in the *Ossowski* matter claims the St. Joseph Transitional Rehabilitation Center put another patient with COVID-19 symptoms in Ms. Ossowski's room which led her to contract COVID-19.[125] Ms. Centola's estate in the *Centola* matter claims the Victoria Manor Nursing Home failed to provide its staff and patients with personal protective equipment – such as masks, gowns, and eyewear – and even discouraged or prohibited the use of masks until late March 2020 causing Ms. Centola to contract COVID-19.[126] But in the *Olaso* matter, Ms. Olaso's estate claims the Alexandria Care Center

reported ninety-one cases of COVID-19 among residents and staff in May 2020 which resulted in employees not showing up for work and led to Ms. Olaso contracting COVID.[127]

Genesis seemingly created unified policies and protocols in the wake of COVID-19 for its operating companies to implement in the hundreds of facilities. But the residents are suing – almost always – for the operating company's actions which led the resident to contract COVID-19.

### B.    Whether the COVID-related claims constitute a single or multiple health care events is ripe for our review.

The variety of claims against operating companies based on varying injuries due to varied reasons tied somehow to the COVID-19 pandemic led us to question whether the issues before us are justiciable. The parties ask us to decide whether these claims are a single health care event should Genesis face a loss more than $3 million. We asked counsel to explain our subject matter jurisdiction during our initial pretrial conference. Counsel explained they would show the $3 million in loss by the close of discovery. They now confirm Genesis has paid approximately $1.3 million as of the close of discovery and expect to lose another $300,000 in the next five months or so. We could not discern the ripeness of the issues from the face of the pleadings. We asked counsel after studying their summary judgment papers to show cause as to how we can exercise subject matter jurisdiction.[128]

We appreciate National Fire and Genesis would like an answer today; they agree the question of whether the claims constitute a single or multiple health care events under National Fire's Primary and Excess Policies is ripe for our review.[129] National Fire cites Genesis's December 22, 2021 letter notifying MedPro of its self-insured retention reserves, which includes both anticipated and incurred claims expense and loss payments, for the current underlying lawsuits and pre-suit claims and potential claims exceeded $4.8 million.[130] But both parties also concede Genesis has incurred losses less than half of the self-insured retention to date.

So how are the parties not asking for an advisory opinion on an unripe issue?  Genesis may never incur $3 million in losses. We are now almost three years after the COVID-19 national health emergency. Statutes of limitations will soon bar claims in many states, if not already. Genesis and/or its operating companies are named in limited lawsuits and claims. We can only issue a declaratory judgment when there is "an actual controversy[.]"[131] Our federal jurisdiction is limited by the doctrine of  "ripeness[.]"[132] "Ripeness" "determines when a proper party may bring an action."[133] "[I]t is difficult to define the contours of the ripeness doctrine with precision" and "[t]he task is even more problematic when defining ripeness in the context of declaratory judgment action."[134] This is because we often issue declaratory judgments before an "accomplished" injury can be established.[135]

We possess a considerable amount of discretion in determining whether and when to entertain an action under the Declaratory Judgment Act.[136] We consider three factors when exercising our discretion in determining ripeness of an action seeking declaratory relief: (1) the adversity of the interest of the parties; (2) the conclusiveness of the judicial judgment; (3) and the practical help, or utility, of the judgment.[137]

### 1.   Genesis's and National Fire's interests are sufficiently adverse.

National Fire brought this case presumably based on Genesis's internal calculations setting a reserve of approximately $4.8 million for all losses. Genesis would not disclose its present reserve, but its counsel thought during oral argument it might be higher than the $4.8 million.  But National Fire "need not suffer a completed harm" to establish adversity of its interest from its insured.[138] And so "to protect against a feared future event" National Fire "must demonstrate [ ] the probability of [the] future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[139] "A ripe controversy between an

insured and an excess insurer can exist even in the absence of proof that the excess policy will be triggered."[140] We studied the facts and reasoning in *Air & Liquid Systems Corporation v. Allianz Underwriters Insurance Company* where Judge Conti found the case ripe as to the question of excess liability coverage although the primary and umbrella policies had not been exhausted – a prerequisite to excess liability coverage – because the insured presented an expert report describing the "plausible" scenarios in which the excess policies could be reached within the next three to five years.[141] Genesis does not offer such expertise. It instead offers its internal reserve as of eleven months ago.

The adversity of the interests of Genesis and National Fire as to the duty to defend the COVID-related claims will not be complete until *after* Genesis reaches its $3 million self-insured retention. But there is more to the adversity analysis. National Fire and Genesis are sufficiently adverse as to create an actual controversy for ripeness purposes. "[T]hey have staked out opposing positions in the instant litigation, they have conflicting financial interests with regard to the issues before [us], and a declaratory judgment here will likely have a significant effect on the settlement posture of the underlying litigation."[142] Genesis has not yet reached its $3 million self-insured retention and paid just over a million dollars in loss in the claims and potential claims which it contends are subject to a single COVID-related self-insured retention.[143] Although we do not have an expert report such as the one Judge Conti relied on in *Air & Liquid Systems Corporation*, Genesis notified National Fire on December 22, 2021 its loss reserves for then existing lawsuits, claims and potential claims COVID-19 claims exceeded $4.8 million.[144]

Our facts are distinct from those in presented in *Step-Saver Data Systems, Inc. v. Wyse Technology*, where our Court of Appeals held the declaratory judgment not ripe and the parties not adverse because their request for relief rested on a "contingency" – "***if*** [the customer suits] can

establish defects as alleged by [Step–Saver's] customers, **then** [suppliers] conduct constituted intentional misrepresentation as to the nature and capacity of their programs and equipment."[145] We have no contingency here. National Fire and Genesis do not dispute coverage under the Primary and Excess Policies. National Fire acknowledges the claims against Genesis and the operating facilities from residents contracting COVID-19 fall under the scope of the insurance agreement.[146]

Although Genesis has not yet reached the $3 million self-insured retention, Genesis already paid over a million dollars in loss in the claims and potential claims and self-reserve over $4.8 million. Genesis grouped at least forty-three known lawsuits and claims (two of which have settled) which it contends are subject to the $3 million self-insured retention. Genesis is also aware of at least 21,999 people who tested positive for COVID-19 and 2,639 people who Genesis "presumed" tested positive at Genesis facilities managed by its operating companies who could potentially bring COVID-19 related suits against Genesis.[147]

### 2.    A declaratory judgment would be conclusive.

We next look to the conclusiveness of the requested declaratory judgment to "determine whether judicial action at the present time would amount to more than an advisory opinion based upon a hypothetical set of facts."[148] As our Court of Appeals instructed in *ACandS* "a disagreement on the insurers' obligations to defend is a 'case or controversy.'"[149]  The parties have more than satisfied this element.

The parties do not dispute National Fire has an obligation to cover Genesis's COVID-related claims once the applicable self-insured retention is met. We are instead asked to define the relative duties and benefits under the Primary and Excess Policies. We are not facing a hypothetical; we are instead addressing an oncoming problem which is substantially likely to

occur, *i.e.*, Genesis and its operating companies will need to pay lawyers and resolve the remaining claims. Genesis and its operating companies need only spend an approximate average of $40,835.94 more on each of the remaining known forty-one unsettled lawsuits and claims to reach the $3 million self-retention.[150]

### 3.     A declaratory judgment will affect the parties' conduct.

We must finally examine the utility of the judgment to determine "whether the parties' plans of actions are likely to be affected by a declaratory judgment . . . and consider[] the hardship to the parties of withholding judgment."[151] Our declaration would conclusively define the obligations of Genesis and National Fire as Genesis and its operating companies work their way towards resolving these claims. They will likely act differently if Genesis is responsible for all losses up to $3 million based on claims as to one operating company/facility as opposed to being responsible for a total of $3 million for all losses in the self-described COVID-19 batch. The parties do not presently know who may end up paying the lawyers and the settlements or judgments (if any) in these pending lawsuits. National Fire is presently not paying those expenses (at least as of a few weeks ago). National Fire's and Genesis's approach (whether individually or jointly) in defending and settling the underlying claims will vary depending on whether Genesis must satisfy a single $3 million self-insured retention or separate $3 million self-insured retentions per "health care event" for the COVID-19 related claims.[152]

We find the parties sufficiently adverse and the question of whether the COVID-related claims constitute a single or multiple health care events presents an actual controversy today ripe for our review.

### C.    The COVID-related lawsuits and claims arise from multiple health care events in multiple facilities managed by separate operating companies.

National Fire seeks a declaratory judgment the underlying COVID-19 claims and lawsuits arise from separate health care events based on the policy language and Pennsylvania law.[153] Genesis seeks summary judgment the underlying claims and lawsuits arise from a single health care event based on the plain language of the policy and Pennsylvania law.[154] We agree with National Fire as a matter of law.

### 1.    The plain language of the Primary and Excess Policies.

Genesis contends the Primary Policy language requires the grouping of all COVID-related claims against Genesis as a single health care event because "they arise from whether or not Genesis engaged in measures sufficient to protect its residents from contracting COVID-19."[155] Genesis also cites National Fire initially treated all COVID-related lawsuits and claims as a single health care event and looks to the underwriting materials to support its position the policy language is clear.[156] National Fire contends the plain language supports its position multiple health care events exist at each separate Genesis location based on the definition of a "health care event."[157]

"Under Pennsylvania law it is well-established that the interpretation of an insurance policy is a matter of law that may be properly resolved at summary judgment."[158] We must interpret the plain language of the contract read in its entirety, giving effect to all its provisions.[159] We must determine the intent of the parties "as manifested by the language of the written agreement."[160] The insurance contract language serves as the best evidence of the parties' reasonable expectations.[161]

We must give effect to the plain language of the agreement where the language is clear and unambiguous.[162] But "when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract[']s prime purpose of indemnification and against the

insurer, as the insurer drafts the policy and controls coverage."[163] "[A] carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage."[164]

The parties agreed the Primary Policy requires National Fire pay on behalf of Genesis and its operating companies all loss and claims expenses arising from a "health care event" subject to an applicable deductible or self-insured retention (here, the $3 million self-insured retention) and up to its limits of liability.[165] The Primary and Excess Policies define a "health care event" as "any event in the rendering of, or failure to render, professional services that results in injury."[166] The Policies provide "[a]ll injuries arising out of, or in connection with, *the same or related acts or omissions* in *furnishing professional services* shall be *considered one health care event*."[167] "Professional services" includes "treatment" defined as "medical, surgical, dental, mental health, or nursing services[.]"[168] The Primary Policy language confirms there could be one health care event with one self-insured retention over multiple locations.[169]

National Fire and Genesis do not dispute coverage under the Primary and Excess Policies – National Fire acknowledges the claims against Genesis and its subsidiaries from residents contracting COVID-19 at the facilities fall under the scope of the insurance agreement.[170] Both parties also contend the Primary and Excess Policy language is clear and unambiguous.[171] The dispute instead concerns whether these forty-three known lawsuits and claims, along with potentially thousands of COVID-positive claims constitute a single or multiple health care events giving rise to one or multiple $3 million self-insured retentions. We consider the underlying facts of these known lawsuits, claims, and potential claims to determine whether "all injuries arise[] out of, or in connection with, the same or related acts or omissions in furnishing professional service" consistent with the Primary and Excess Policy language.[172]

###### 2.     The known lawsuits, claims and potential claims involve multiple health care events under the "cause" test.

Both parties agree the number of health care events is determined by the "cause" test under Pennsylvania law.[173] But National Fire argues the cause test establishes the COVID-19 claims must be grouped as multiple health care events, while Genesis argues the COVID-19 claims must be grouped as a single health care event.[174] We find the cause test supports the COVID-related exposures and injuries at different Genesis locations constitute multiple health care events.

Pennsylvania follows the "cause" test for determining the number of "occurrences" arising from a given claim.[175] Although National Fire defines an "event" as an "accident" instead of an "occurrence" in the Primary Policy, the Pennsylvania Supreme Court has construed "accident" and "occurrence" synonymously.[176]

We focus on the "cause" or "causes" of the injury to determine the number of occurrences and consider whether there is a single cause or multiple causes for the losses sustained.[177] "[A]ll injuries arising from the same source arise from one occurrence[,]" when there is a single "proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage."[178] If we can identify a common source of the injuries, and thus a single occurrence, it is immaterial that multiple individuals were injured as a result.[179] Genesis asks us to declare COVID-19 is the health care event and claims its common COVID-related policies require it fall under a single health care event. Genesis purchased an insurance policy agreeing a single health care event arises from same or related acts or omissions in furnishing professional services.

And so we need to determine whether the claims directly or loosely based on the operating companies' responses to the COVID-19 pandemic can be, in and of itself, the single health care event. Or is it more like the flu or other illnesses common to most of us based on our exposures? We are not faced with a food poisoning outbreak at health care facilities serving the same meal

from the same farm or a novel disease attendant to only one facility such as a Legionnaires Disease at a Philadelphia hotel decades ago.[180] We are also not comfortable, and counsel has not afforded expertise, allowing us to confirm the nature and spread of COVID-19 based solely on one or two modalities. We recall the confusion among all of us in the early stages of the pandemic; we washed our groceries, we wiped down our door handles, we stayed inside for fear of airborne contaminants, and we then stayed outside to avoid spread, we could not touch our faces, and we did not know whether masks helped or which types of masks may help.[181] We need to decide whether the claims challenging the operating companies' responses to COVID-19 pandemic arise from same or related acts or omissions when no one knew how to address a pandemic response let alone set a uniform policy (never shown to us) detailing steps like a nursing home could do with infected food or arising from negligence by one group of employees in one facility.

Counsel has not shown, and we could not find, other judges facing this issue for these types of facilities. We must look for general guidance. We first look to cases where applying Pennsylvania's "cause" test resulted in the court finding one single occurrence for insurance coverage purposes as Genesis essentially asks today. In *Donegal Mutual Insurance Company v. Baumhammers*, the Pennsylvania Supreme Court held parents' alleged negligence resulting in their son engaging in a shooting spree where he killed five individual victims and injured one victim at four different locations over a two-hour period constituted one single "occurrence" under the parents' homeowner insurance policy.[182] The Pennsylvania Supreme Court, applying the cause test, focused on the act of the parents giving rise to their liability – their negligence in failing to confiscate their son's weapon and/or notify the police or mental health providers of his unstable condition.[183] The court reasoned "[b]ecause coverage is predicated on parents' inaction, and the resulting injuries to the several victims stem from that one cause . . . parents' alleged single act of

28

negligence constitutes one accident and one occurrence."[184] The parents knew or should have known of their son's instability and failed to act.  We are not facing a similar knowledge base.

Our Court of Appeals applying Pennsylvania law in the toxic tort setting has repeatedly found the negligent inclusion of a potentially dangerous chemical in a product constitutes a single occurrence.[185] For example, in *Liberty Mutual Insurance Company v. Treesdale, Inc.,* our Court of Appeals held all injuries caused by claimants' exposure to the insured manufacturer's asbestos product constituted a single occurrence.[186] Our Court of Appeals reasoned all the claimants' injuries arose from one common source – the manufacture and sale of the asbestos-containing products.[187] Our Court of Appeals similarly held in *Sunoco, Inc. v. Illinois National Insurance Company* all injuries resulting from the hazardous manufacture of gasoline containing methyl tertiary-butyl ether (MtBE) constituted a single occurrence.[188] Our Court of Appeals recognized the underlying seventy-seven cases alleging injuries from MtBE "are not identical" and "allege contamination in different geographic regions" from "a variety of sources including gas tank leaks and accidental spills from pipelines, and the plaintiffs vary from individuals to governmental entities" but "each plaintiff suing Sunoco was exposed to the same general harmful condition – gasoline containing MtBE – which resulted in contaminated ground water."[189]

In *Appalachian Insurance Company v. Liberty Mutual Insurance Company*, our Court of Appeals also found a single occurrence where an employer adopted certain employment policies applicable to female employees in its claims department.[190] Female employees filed a class action alleging the employer discriminated against them based on their sex in the hiring, promoting, and compensating of females due to these policies and settled their claims with the employer.[191] The insurer then sued the employer asking the court to declare its obligations under the employer's insurance policy.[192] Our Court of Appeals found a single occurrence took place under the

employer's insurance policy when the employer adopted the employment policies which resulted in liability for sex discrimination.[193] Our Court of Appeals recognized the claim involved multiple injuries of different magnitudes extending over a period of time. But these facts did not alter the Court's conclusion of one occurrence because "[a]s long as the injuries stem from one proximate cause there is a single occurrence."[194]

In *Flemming ex rel. Estate of Flemming v. Air Sunshine, Inc.*, the surviving spouse of a man who died as a result of a plane crash sued the airline and pilot seeking recovery under the airline's insurance policy.[195] The man survived the initial crash but drowned when the plane sank into the ocean.[196] The policy at issue limited coverage to $500,000 for each person per "occurrence."[197] The spouse alleged four separate "occurrences" under the airline's insurance policy: (1) the plane crash itself; (2) the failure to provide a pre-flight safety briefing; (3) the failure to notify passengers of the impending crash and the failure to provide emergency safety instructions; and (4) after the crash, the failure to provide any aid to the decedent.[198] Our Court of Appeals, largely relying on *Appalachian Insurance Company*, applied the "cause" test and found the plane crash constituted one "constant, uninterrupted cause" which subjected the man to "continuous or repeated exposure to substantially the same general conditions and led to his death."[199]

We must now compare the facts in cases where our colleagues have found multiple occurrences under the cause test. For example, Judge Cercone and Judge Bartle applied the "cause" test to find the loss arose from separate occurrences under the applicable insurance policies. In *American Home Assurance Company v. Superior Well Services, Inc.*, Judge Cercone found fracking services performed by Superior Well Services which caused damage to fifty-three "separate and distinct mines" each constituted a separate occurrence under the insurance policy.[200]

Judge Cercone applied the cause test and found the damages to the wells "were not the result of a single, proximate, uninterrupted, and continuing cause" instead, "the damages occurred to different wells, at different locations, at different times and resulted from separate [] fracking incidents."[201]

Judge Bartle, in *Busby v. Steadfast Insurance Company*, applied the cause test and held a car accident where the driver rear-ended one car and then a third car rear-ended the driver constituted two accidents for purposes of determining policy limits.[202] Judge Bartle found the circumstances of the car accident to be unlike those in *Donegal*, *Appalachian Insurance Company*, and *Flemming*, because the car accidents involved *two* independent actors who caused *two* separate collisions.[203]

We find the residents' claims against Genesis and (more often) its operating companies are more like the situation where judges applying the cause test have found multiple occurrences. We cannot find all the COVID-related injuries in the known lawsuits and claims against Genesis "stem from one proximate cause[.]"[204] All the injuries in the known lawsuits, claims, and potential claims do not stem from a common source. Each facility where the resident contracted COVID-19 is operated by a separate Genesis subsidiary – Genesis itself does not operate the nursing home facilities.[205] Although Genesis established company-wide protocols in the wake of COVID-19, these protocols are not the sole proximate cause of the alleged COVID-related injuries. We cannot find the "same or related acts or omissions in furnishing professional services" caused each resident at different facilities to contract COVID-19. It is instead the rendering of professional services to residents at separate Genesis locations, operated by different operating companies which led to residents contracting COVID-19.

We face facts like those reviewed by Judge Cercone in *Superior Well Services, Inc.*, where Judge Cercone found faulty fracking services which caused damage to fifty-three "separate and

distinct mines" each constituted a separate occurrence under the insurance policy.[206] As in *Superior Well Services, Inc.*, the alleged COVID-19 injuries occurred to different residents at different facilities, at different times and resulted from separate acts of provider negligence.

We are also persuaded by Judge Bartle's reasoned decision in *Busby* where he found a car accident constituted two separate accidents for purposes of determining policy limits where the car accident involved two independent actors who caused two separate collisions.[207] The known lawsuits, claims, and potential claims against Genesis and its subsidiaries involve thirty-two separate Genesis locations. Genesis developed company-wide protocols for its subsidiaries to follow in the wake of COVID-19. But, given Genesis is ultimately a shell company and does not actually operate or have ultimate control over the nursing home facilities, each Genesis location acted independently when it engaged in professional services – including whether to follow certain COVID-19 protocols or not – which caused its residents to contract COVID-19.

Our facts are distinguishable from those in *Donegal*, where the Pennsylvania Supreme Court held a shooting spree which impacted six individuals at four separate locations constituted one single "occurrence."[208] There, the court focused on the act of the parents giving rise to their liability – their failure to confiscate their son's weapon and/or call the authorities.[209] Here, Genesis's negligence in adopting or enforcing its COVID-19 policies is not the common source of the alleged COVID-19 injuries. It is instead the negligence of the *individual providers* at the *separate facilities* giving rise to the insurance coverage. Unlike the parents in *Donegal* who could control their son's actions, there is no evidence Genesis controls how the individual nursing home facilities render their professional services other than providing some guidance.

We are also faced with facts distinct from those in *Appalachian*, where our Court of Appeals held an employer's policies resulting in liability for sex discrimination constituted a single

occurrence.[210] Here, the ultimate cause of known lawsuits, claims, and potential claims are not the COVID-19 policies and protocols Genesis established. The facts of the known lawsuits, claims, and potential claims demonstrate the ultimate cause of the COVID-19 exposures and injuries were the acts of the health care providers at the different facilities. For example, in the *Centola* matter, Ms. Centola's estate claims the Victoria Manor Nursing Home in New Jersey failed to follow COVID-19 protocols by, among other things, not providing its staff or patients with personal protective equipment – such as masks, gowns, and eyewear – and even discouraged or prohibited the use of masks until late March 2020 causing Ms. Centola to contract COVID-19.[211] But in the *Olaso* matter, Ms. Olaso's estate claims the Alexandria Care Center in Torrance, California reported ninety-one cases of COVID-19 among residents and staff in May 2020 which resulted in employees not showing up for work and led to Ms. Olaso contracting COVID-19.[212] These two cases demonstrate different Genesis facilities acting in separate and distinct ways, which caused Mr. Centola and Ms. Olaso to contract COVID-19 a month apart.

The toxic tort line of cases are also distinguishable because we cannot point to a sole cause which Genesis controlled – such as a potentially dangerous chemical or an asbestos containing product – as the one source of the residents' COVID-19 exposures. The known lawsuits, claims, and potential claims against the operating companies are not identical and allege injuries in different geographic regions at different times from a variety of sources, similar to the individuals exposed to MtBE in *Sunoco*. But this is where the similarities end. In *Sunoco*, "each plaintiff suing Sunoco was exposed to the same general harmful condition" but here the residents' exposure to COVID-19 arose from *different* conditions based on the separate and distinct acts of different employees at different facilities operated by separate operating companies at different times. The allegedly injured residents are not claiming one common source led to their COVID-19 exposure,

but instead the conduct which resulted in the residents contracting COVID-19 differed at the various facilities. We are also faced with a group of known lawsuits and claims where the residents or their estates are not even claiming COVID-related injuries, but allege injuries completely unrelated to COVID-19 – such as the *Henry* matter (pressure sores), the *Parks* matter (injuries related to falls), the *Reis* matter (injuries related to falls), the *Busch* matter (skin breakdown and pressure sores), the *Rojas* matter (bed sores, weight loss, and malnutrition), and the *Hampton* matter (pressure wounds).[213] These residents' alleged injuries are all based on very different conditions.

Even those residents who contracted COVID-19 at the different Genesis locations were not subjected to the same general conditions. Our facts are markedly unlike those in *Flemming*, where our Court of Appeals found the plane crash constituted one "constant, uninterrupted cause" which subjected the man to "continuous or repeated exposure to substantially the same general conditions and led to his death."[214] Instead, looking at the facts of the known lawsuits and claims – which Genesis urges us not to do – the residents and their estates allege different negligent acts at the different facilities led to them contracting COVID-19. For example, Ms. Santo's estate claims, among other things, the Milford Center in Delaware co-mingled presumptively positive residents with asymptomatic residents, allowed employees at the Milford Center to improperly use personal protective equipment, housed up to four residents in one room, and failed to maintain proper policies and procedures for COVID-19.[215] But Mr. Wayne's wife and daughter sue the PowerBack facility in Colorado because the facility discharged Mr. Wayne from facility but failed to inform his family he had been exposed to COVID-19.[216]

The residents' alleged exposure to COVID-19 and their resulting injuries arise from their stay at different Genesis facilities, operated by separate and distinct Genesis subsidiaries, at

different locations. The COVID-related injuries are the result of separate and unrelated acts or omissions made by the thirty-two operating companies and presumably hundreds of their employees.

We cannot find COVID-19 is a single health care event based on these claims shown to us. We would face a different question if COVID-19 limited itself to one facility or arose due to some chemical or pharmaceutical error. Or even if the allegedly injured residents claimed a particular policy applied across all the 400 operating companies actually caused COVID-19. But those are not the undisputed facts.

The underlying lawsuits and pre-suit claims and potential claims arise from multiple health care events. Genesis must satisfy a self-insured retention for each health care event before National Fire is obligated to provide coverage for the underlying lawsuits and pre-suit claims and potential claims. But we find, and as National Fire concedes, the COVID-related injuries to multiple residents at the *same* location during a COVID-19 outbreak may be considered a single health care event because the injuries are the result of the same or related acts in the furnishing of professional services by the same operating company and its employees.[217]

### 3.    National Fire's early course of performance does not alter our analysis.

Genesis argues National Fire's treatment of the COVID-related injuries before National Fire sent its reservation of rights letter and the underwriting materials confirm all COVID-19 claims constitute a single health care event.[218] Genesis cites emails from MedPro in November 2020 where MedPro informed Genesis it planned to watch the COVID cases "a little more closely than we otherwise would" "[b]ecause all the COVID cases have only 1 [self-insured retention]."[219] MedPro again referenced "the sole [self-insured retention] on the Genesis COVID claims" and the need to "keep closer tabs on those pending claims that remain in pre-suit stage" in an email to

Genesis on December 16, 2020.[220] Genesis also contends National Fire gave two initial COVID-19 claims involving residents at *different* locations the same event number – which would group them under a single self-insured retention.[221] But MedPro's Jeffrey Gerson testified this numerical assignment occurred by mistake.[222] Genesis does not impeach this explanation, but claims "no weight should be accorded" to it.[223]

Pennsylvania case law instructs us "course of performance" can only be used to interpret, but not supplement, the terms of an existing agreement.[224] "[W]here the course of performance contradicts the unambiguous language of the contract, the court should not allow the course of performance to supersede the language of the contract."[225] Although we can use National Fire's course of performance in interpreting contract terms, "express terms are given greater weight than course of performance[.]"[226]

We give effect to the unambiguous policy language and hold the COVID-19 injuries arising from different facilities, stemming from different COVID-19 outbreaks constitute multiple health care events under the Primary and Excess Policies.[227]

### 4. The underwriting materials do not change our analysis interpreting the unambiguous policy language.

Genesis also argues National Fire's underwriting materials confirm both parties understood a single health care event could encompass multiple locations.[228] Genesis directs us to a June 22, 2020 email where MedPro's Senior Underwriter Denise Gibson-Terry replied to an email from Genesis – before Genesis sent its first notice of the COVID claims and lawsuits – confirming "[t]he [self-insured retention] on the policy is $3M per Event so even if there are multiple locations involved in one Event, the [self-insured retention] is $3M per Event."[229] This email does not reference COVID-19, but generally states the $3 million self-insured retention is  "per event" and even if there are multiple locations involved in *one* event, the self-insured retention is $3 million.

36

MedPro's email does not change how we must interpret the unambiguous policy language. We found the COVID-19 claims involve *multiple* health care events and thus the single $3 million self-insured retention does not apply. We did not base our analysis solely on the fact the COVID-19 claims arose from different locations. We instead interpreted the plain language of the Primary Policy and applied the cause test. We could not find one sole proximate cause for all the COVID-related known lawsuits and claims because the COVID-19 injuries occurred at different locations controlled by different operating companies staffed with different employees, and the residents alleged different causes for contracting COVID-19.

**D.    All COVID-19 related claims do not relate back to Genesis's first notice because they are separate health care event.**

Genesis asks we declare all COVID-19 related claims relate back to Genesis's first notice of its first COVID-19 claim, even if there are no allegations about COVID-19 in the demand letters or complaints.[230] National Fire asks us to declare the *Figueroa* matter, which it claims does not involve the same health care event reported to it before December 1, 2020, is not covered under its  policies in effect from December 1, 2019 to December 1, 2020.[231] National Fire also argues a claim not asserting a COVID-19 injury as a result of contracting COVID at an operating company's facility does not arise from the same health care event as, and cannot be grouped with or relate back to, a lawsuit, claim or potential claim in which a resident asserts a claim for a COVID-19 injury.[232] We agree with National Fire for two reasons.

First, the claims against Genesis alleging COVID-related injuries do not relate back to Genesis's first notice of its first COVID-19 claim because, as detailed above, the COVID-19 claims involve *multiple* health care events.[233] The Primary Policy provides all claims and potential claims for damages arising out of, or in connection with the same "health care event" will be deemed to have been made on the date the first claim is made against Genesis, or the date Genesis

discovers the first potential claim, whichever is earlier.[234] "All injuries arising out of, or in connection with, the *same or related acts or omissions* in furnishing professional services shall be considered one health care event."[235]

According to the plain language of the Primary Policy, only those claims and potential claims arising out of, or in connection with the *same* health event relate back to the date the first claim is made. Genesis first notified National Fire of the *Figueroa* matter on July 13, 2021. The parties adduced no evidence Genesis notified National Fire of a health care event involving Ms. Figueroa or the Anaheim Terrace Care Center – where Ms. Figueroa allegedly contracted COVID-19 and died – before December 1, 2020.[236] The *Figueroa* matter is not covered by National Fire policies in effect from December 1, 2019 to December 1, 2020.

Second, Genesis asks us to declare the known lawsuits and claims *not* alleging COVID-related injuries still arise from the same health care event as the COVID-related injuries because the resident contracted COVID-19 at some point in time. We find this request for declaratory judgment not ripe for our review based on our finding the COVID-related injuries arise from multiple health care events and Genesis must satisfy a separate $3 million self-insured retention for each health care event.

The parties adduced no evidence Genesis has satisfied, is even close to satisfying or ever will satisfy, the separate $3 million self-insured retention for any <u>one</u> of the COVID-related health care events. Genesis cannot demonstrate the probability of it satisfying the $3 million self-insured retention per any one health care event "is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[237] We "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."[238]

All Genesis has provided is the *total* amount of Genesis's self-insured retention reserves, which includes both anticipated and incurred claims expense and loss payments, for the current underlying lawsuits and pre-suit claims and potential claims exceeded $4.8 million at all facilities.[239] Although we found this amount sufficient for us to issue a declaratory judgment as to whether the claims Genesis places in the COVID-19 batch arise from a single or multiple health care events – as we found the possibility of Genesis satisfy one $3 million "real and substantial" – this amount is insufficient for us to decide whether claims not alleging COVID-19 injuries arise from the same health care event as those alleging COVID-related injuries.

## IV.    Conclusion

The residents' alleged COVID-related injures arise from operating companies' varied responses to COVID in different facilities operated by different operating companies at different locations. The claims do not involve the same professional services in response to an undefined pandemic.  The allegations involve separate and unrelated acts or omissions made by the thirty-two distinct operating companies and their employees. Multiple residents do not claim a specific Genesis internal policy caused them to become ill from COVID-19.  Multiple residents do not attribute their alleged harm to the absence of a specific Genesis policy. Nor could they in good faith. The residents instead allege a variety of inadequacies by the operating companies and others which are not tied to a particular Genesis internal policy.

National Fire demonstrated it is entitled to judgment as a matter of law, requiring we declare: (1) the underlying lawsuits and pre-suit claims and potential claims arise from multiple heath care events and Genesis must satisfy a self-insured retention for each health care event before National Fire is obligated to provide coverage for the underlying lawsuits and pre-suit claims and potential claims; and (2) only those underlying lawsuits, pre-suit claims and potential claims or

future claims involving the same health care event as those claims or potential claims first reported to National Fire before the December 1, 2020 expiration of the Primary Policy will be considered a claim made or a potential claim discovered during the policy period.

---

[1] Our Policies require a Statement of Undisputed Facts ("SUMF") and appendix in support of summary judgment. The parties submitted an amended joint appendix ("J.A.") in support of their cross-motions for summary judgment at ECF Doc. Nos. 86-4 through 86-97, and 88-3. References to the Joint Appendix ("J.A.") shall be by Bates number, for example, "J.A. 1." National Fire filed its amended SUMF at ECF Doc. No. 86-1 ("National Fire SUMF"). Genesis responded at ECF Doc. No. 87-2 ("Genesis Response to SUMF"). Genesis filed its amended SUMF at ECF Doc. No. 88-2 ("Genesis SUMF"). National Fire responded at ECF Doc. No. 85-1 ("National Fire Response to SUMF").

[2] National Fire SUMF ¶ 12; ECF Doc. No. 86-2 at 7.

[3] National Fire SUMF ¶ 12; National Fire Response to SUMF ¶ 51.

[4] National Fire SUMF ¶ 14; National Fire Response to SUMF ¶ 53; J.A. 153a–154a.

[5] National Fire SUMF ¶ 1; Genesis Response to SUMF ¶ 1; J.A. 15a–94a.

[6] National Fire SUMF ¶ 3; Genesis SUMF ¶ 1; J.A. 15a–94a.

[7] National Fire SUMF ¶ 2; Genesis Response to SUMF ¶ 2; J.A. 95a–150a.

[8] J.A. 15a–94a.

[9] The Primary Policy provides:

> The company [National Fire] will pay on behalf of any insured [Genesis] all loss and claims expense, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a health care event that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the loss or claims expense must arise from:
>
> 1. a claim that was first made against, and received by, an insured during the policy period, and reported to the company, in writing, during the policy period or within any applicable extended reporting period; or
> 2. a potential claim that was first known about or discovered by an insured during the policy period, and reported to the company, in writing, during the policy period or within the automatic limited extended reporting period. *Id*. at 45a.

The Primary Policy defines a "claim" as "an express, written demand upon an insured for money or services as compensation for damages, including a suit." *Id*. at 26a. A "potential claim" means

"an event, including an incident arising from, or in connection with, that event, which an insured knows or reasonably should know is likely to result in a claim." *Id*. at 32a.

[10] *Id*. at 45a.

[11] *Id*. at 28a (emphasis added).

[12] *Id*. at 27a.

[13] *Id*.

[14] "Professional Services" is defined as "treatment, administrative services, beautician's and barber's services, pastoral counseling services, peer review and utilization management not involving managed care services." *Id*. at 32a. "Treatment means medical, surgical, dental, mental health, or nursing services . . . [.]" *Id*. at 33a.

[15] *Id*. at 20a.

[16] *Id*. at 33a–34a.

[17] *Id*. at 95a–150a. The Excess Policy provides: "The company will pay on behalf of any insured all loss and claims expense, which is excess of any underlying coverage, and subject to any applicable Maintenance Retention, up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a health care event that took place on or after the applicable Retroactive Date shown on the Declarations." *Id*. at 125a. The Maintenance Retention states "$Nil Per Event[.]" *Id*. at 99a.

[18] *Id*. at 108a ("Health care event means any event in the rendering of, or failure to render, professional services that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing professional services shall be considered one health care event.").

[19] *Id*. at 167a.

[20] *Id*.

[21] J.A. 157a; Genesis SUMF ¶ 12.

[22] J.A. 157a–158a.

[23] *Id*. at 167a–168a.

[24] Genesis SUMF ¶ 12. Genesis did not produce a document, manual, or policy describing this protocol. The adduced evidence consists of a notice and deposition testimony summarizing steps and goals. Genesis seems to rely on some uniform policy under attack in these forty-three claims but neither it nor the residents claiming harm in the underlying claims cite such a particular policy.

[25] J.A. 167a–168a.

[26] Genesis SUMF ¶ 13.

[27] J.A. 167a–168a; National Fire Response to SUMF ¶ 2.

[28] J.A. 168a.

[29] *Id*.

[30] *Id*.

[31] *Id*. at 170a–174a.

[32] *Id*.

[33] *Id*. at 199.1a–199.439a.

[34] Genesis SUMF ¶ 15.

[35] J.A. 1234a.

[36] *Id*. at 1196a.

[37] *Id*. at 1186a.

[38] *Id*. at 1183a.

[39] *Id*. at 1192a.

[40] *Id*. at 201a.

[41] *Id*. at 212a.

[42] *Id*. at 176a–186a.

[43] *Id*. at 185a–186a.

[44] *Id*. at 217a–240a.

[45] *Id*. at 236a.

[46] *Id*. at 237a.

[47] *Id*. at 1226a.

[48] *Id*.

[49] *Id*. at 1227a.

[50] *Id*.

---

[51] ECF Doc. Nos. 1, 7.

[52] ECF Doc. No. 7.

[53] ECF Doc. No. 23.

[54] *Id*.

[55] J.A. 161a–162a; National Fire SUMF ¶ 132.

[56] National Fire SUMF ¶¶ 31–36, 43–73, 89–127.

[57] J.A. 252a–277a, 282a–305a, 360a–400a, 407a–429a, 431a–439a, 446a–454a, 458a–495a, 497a–512a, 523a–353a, 540a–576a, 578a–602a, 609a–624a, 626a–671a. Genesis later removed six of the twelve lawsuits from its COVID-19 batch after the parties in those suits informed Genesis or its operating company they would not pursue COVID-related claims. *See* J.A. 514a–521a, 537a–538a, 604a–606a, 673a–674a, 1176a–1177a, 1179a–1181a.

[58] Genesis SUMF ¶ 48.

[59] J.A. 514a–521a, 537a–538a, 604a–606a, 673a–674a, 1176a–1177a, 1179a–1181a.

[60] *Id*. at 279a, 456a.

[61] We provide these facts as background. The underlying facts of each known lawsuit are thoroughly provided in the parties' Joint Appendix. *See* ECF Doc. Nos. 86-4 through 86-97 and 88-3.

[62] J.A. 252a–277a.

[63] *Id*. at 281a–304a.

[64] *Id*. at 360a–400a, 402a–404a.

[65] *Id*. at 407a–429a.

[66] *Id*. at 540a–576a.

[67] *Id*. at 609a–624a.

[68] *Id*. at 804a–852a.

[69] *Id*. at 853a–873a.

[70] *Id*. at 875a–890a, 897a.

[71] *Id*. at 901a–928a.

[72] *Id*. at 930a–950a.

[73] *Id*. at 952a–966a.

[74] *Id*. at 968a–983a.

[75] *Id*. at 1048a–1070a.

[76] *Id*. at 1072a–1093a.

[77] *Id*. at 446a–454a.

[78] *Id*. at 985a–994a, 996a.

[79] *Id*. at 998a–1005a.

[80] *Id*. at 1006a–1046a.

[81] *Id*. at 1095a–1106a.

[82] *Id*. at 1108a–1132a.

[83] *Id*. at 1134a–1136a, 1140a.

[84] *Id*. at 1148a–1170a.

[85] *Id*. at 1172a.

[86] *Id*.

[87] *Id*. at 242a–250a.

[88] National Fire SUMF ¶¶ 37–42, 74–88.

[89] *Id*. ¶¶ 37–42, 74–88.

[90] J.A. 307a–311a, 320a–323a, 335a, 348a–351a, 353a–354a, 680a–691a.

[91] Genesis SUMF ¶ 48.

[92] We provide these facts as background. The underlying facts of each claim are thoroughly provided in the parties' Joint Appendix. *See* ECF Doc. Nos. 86-4 through 86-97 and 88-3.

[93] J.A. 307a–311a, 313a–318a.

[94] *Id*. at 320a–323a, 325a–331a.

[95] *Id*. at 335a, 337a–388a, 340a–347a.

[96] *Id*. at 349a–351a.

[97] *Id*. at 353a–354a, 356a–357a.

[98] *Id.* at 680a–691a.

[99] *Id.* at 723a–730a.

[100] *Id.* at 720a–721a.

[101] *Id.* at 693a–697a, 699a.

[102] *Id.* at 701a–702a.

[103] *Id.* at 704a–709a.

[104] *Id.* at 711a, 713a–718a.

[105] *Id.* at 740a–741a, 743a–746a.

[106] *Id.* at 748a–749a, 751a–760a.

[107] *Id.* at 762a–766a.

[108] *Id.* at 768a–773a.

[109] *Id.* at 775a.

[110] *Id.* at 777a–779a.

[111] *Id.* at 781a.

[112] *Id.* at 787a–788a, 790a–802a.

[113] *Id.* at 199.1a–199.493a.

[114] ECF Doc. Nos. 64, 86. Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)).

If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

[115] ECF Doc. No. 86-2.

[116] *Id.* at 8.

[117] *Id.*

[118] ECF Doc. No. 88-1.

[119] *Id.* at 7.

[120] ECF Doc. No. 86-2 at 16–17.

[121] ECF Doc. No. 88-1 at 12.

[122] ECF Doc. No. 87 at 19–21.

The thirty-two operating facilities involved in the remaining forty-three known lawsuits and claims include: Brier Oak on Sunset, Arden House, Holly Manor Center, Keene Center, PowerBack Rehabilitation – Lafayette, Elms Haven Center, Arbor Glen Center, Milford Center, Orchard Ridge, Spring Senior Assisted Living, Earlwood Center, Alexandria Care Center, St. Joseph Transitional Rehabilitation Center, Victoria Manor Nursing Home, Sandia Ridge Center, Hamilton Arms Center, Anaheim Terrace Care Center, Fairland Center, Crestwood Center, Ridgewood Center, Lafayette Center, Everett Center, La Estancia Nursing and Rehabilitation Center, Woodland Care Center, Kimberly Hall Health Center, Loch Raven Center, Bedford Hills Center, Mercerville Center, Millville Center, Voorhees Center, Brandywine Hall, and Chapel Manor Nursing Home. J.A. at 252a–277a, 282a–305a, 307a–311a, 320a–323a, 335a, 348a–351a, 353a–354a, 360a–400a, 407a–429a, 431a–439a, 446a–454a, 458a–495a, 497a–512a, 523a–353a, 540a–576a, 578a–602a, 609a–624a, 626a–671a, 680a–691a, 693a–697a, 701a–702a, 704a–709a, J.A. 711a, 720a–721a, 723a–730a, 740a–741a, 748a–749a, 762a–766a, 768a–773a, 775a, 777a–779a, 781a, 787a–788a, 804a–852a, 853a–873a, 875a–890a, 901a–928a, 930a–950a, 952a–966a, 968a–983a, 985a–994a, 1006a–1046a, 1048a–1070a, 1072a–1093a, 1095a–1106a, 1108a–1132a, 1134a–1136a, 1148a–1170a.

[124] J.A. 1120a.

[125] *Id*. at 1055a.

[126] *Id*. at 1095a–1106a.

[127] *Id*. at 1006a–1046a.

[128] ECF Doc. No. 68.

[129] ECF Doc. No. 7 ¶ 9; ECF Doc. No. 23 at 26.

[130] ECF Doc. No. 74.

[131] *Step-Saver Data Sys., Inc. v. Wyse Tech*., 912 F.2d 643, 646 (3d Cir. 1990) (quoting U.S. Const. art. III, § 2).

[132] *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995).

[133] *Id*.

[134] *Step-Saver Data Sys., Inc.*, 912 F.2d at 646.

[135] *Id*.

[136] *Cabot Oil & Gas Corp. v. Jordan*, 698 F. Supp. 2d 474, 476 (M.D. Pa. 2010) (quoting *Wilton v. Seven Falls Co*., 515 U.S. 277, 282 (1995)) ("[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."); *Air & Liquid Sys. Corp. v. Allianz Underwriters Ins. Co*., No. 11-247, 2013 WL 5436934, at *9 (W.D. Pa. Sept. 27, 2013) (citing *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 136–37 (2007)) ("Since the language of the Declaratory Judgment Act is permissive rather than mandatory, the court is not *required* to enter declarations clarifying the respective rights and obligations of the parties.")).

[137] *Step-Saver Data Sys., Inc.*, 912 F.2d at 646; *see also J. Ambrogi Food Distribution, Inc. v. Teamsters Loc. Union No. 929*, No. 21-1907, 2022 WL 970844, at *8 (E.D. Pa. Mar. 30, 2022) (internal citations omitted).

[138] *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Engineers, Loc. Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009).

[139] *Id*.

[140] *Air & Liquid Sys. Corp.*, 2013 WL 5436934, at *8.

[141] *Id*. at *7–8.

142 *Home Ins. Co. v. Powell*, No. 95-6305, 1996 WL 269496, at *7 (E.D. Pa. May 20, 1996), *aff'd*, 156 F.3d 1224 (3d Cir. 1998) (citing *ACandS, Inc. v. Aetna Cas. & Sur. Co*., 666 F.2d 819, 823 (3d Cir. 1981) (stating even though a declaratory judgment regarding the duty of various insurers to defend and indemnify an insured might "not result in any immediate payment of damages by the litigants here," this fact is "not determinative" of the question regarding whether an actual controversy existed)).

143 National Fire SUMF ¶ 132.

144 J.A. 185a–186a.

145 *Step-Saver Data Sys., Inc*., 912 F.2d at 647–48 (emphasis added).

146 ECF Doc. No. 88-1 at 6.

147 National Fire SUMF ¶ 132; J.A. 185a–186a, 198a.

148 *Pittsburgh Mack Sales & Serv., Inc.*, 580 F.3d at 190.

149 *ACandS, Inc.*, 666 F.2d at 822–23.

150 Genesis already spent $1,325,726.30 in claims expenses and loss in claims. *See* J.A. 161a–162a; National Fire SUMF ¶ 132. Genesis now must spend $1,674,273.70 until it reaches $3 million, which is an approximate average of $40,835.94 for each of the remaining forty-one known lawsuits and claims which have not settled. We are only aware of Genesis settling two cases. J.A. at 279a, 456a. But Genesis may have settled more lawsuits since discovery closed.

151 *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 543 (3d Cir. 2017) (internal citations omitted).

152 *See Home Ins. Co*., 1996 WL 269496, at *7 (holding "the utility of this declaratory judgment action, is met in that a declaratory judgment regarding the role of plaintiff in the underlying litigation will facilitate settlement and hence the speedy resolution of the legal malpractice suit."); *see also* ECF Doc. No. 74 at 9–14.

153 ECF Doc. No. 86-2 at 16–25; ECF Doc. No. 85 at 18–23.

154 ECF Doc. No. 88-1 at 12–16.

155 *Id*.

156 *Id*. at 19–26.

157 ECF Doc. No. 85 at 18–23.

158 *Am. Home Assurance Co. v. Superior Well Servs., Inc.*, No. 16-1065, 2022 WL 884694, at *5 (W.D. Pa. Feb. 18, 2022) (citing *Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310, 1313 (Pa. Super. 1996)). "The interpretation of an insurance contract regarding the existence or non-

existence of coverage is 'generally performed by the court.'" *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007) (quoting *Minnesota Fire and Cas. Co. v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004)). National Fire and Genesis agree Pennsylvania law governs the Primary and Excess Policies. *See* ECF Doc. No. 86-2 at 15; ECF Doc. No. 88-1 at 11.

[159] *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011).

[160] *Superior Well Servs., Inc*, 2022 WL 884694, at *5 (quoting *Travelers Cas. & Sur. Co. v. Castegnaro*, 772 A.2d 456, 459 (Pa. 2001)).

[161] *Id.* (citing *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 331 (Pa. Super. 2010)).

[162] *UPMC Health System v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).

[163] *Donegal Mut. Ins. Co.*, 938 A.2d at 290 (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 893 (Pa. 2006)).

[164] *Id.* at 290–91 (quoting *Mutual Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)).

[165] J.A. 45a.

[166] *Id.* at 28a, 108a. An "event" is defined as "an accident." *Id.* at 27a.

[167] *Id.* at 28a, 108a (emphasis added).

[168] *Id.* at 32a–33a.

[169] *Id.* at 20a ("Self-Insured Retentions" for the professional liability coverage includes "$3,000,000 Per Event For All Locations Except KY").

[170] ECF Doc. No. 88-1 at 6.

[171] *Id.* at 9–10; ECF Doc. No. 85 at 18–19.

[172] J.A. 28a, 108a.

[173] ECF Doc. No. 86-2 at 17–22; ECF Doc. No. 88-1 at 19–24.

[174] ECF Doc. No. 86-2 at 17–22; ECF Doc. No. 88-1 at 19–24.

[175] *See Donegal Mut. Ins. Co.*, 938 A.2d at 294–95. The competing approach is the "effects" test, which is not followed in Pennsylvania. *Id.* at 293. Courts employing the "effects" approach calculate the number of occurrences by looking to the *effect* of the accident or, in other words, how many individual claims or injuries resulted. *Id.* The "effects" approach has been applied by a minority of courts. *Id.*

[176] *See id.* at 293. The Primary Policy defines a "health care event" as "any event in the rendering of, or failure to render, professional services that results in injury." J.A. 28a. An "event" is defined as "an accident." *Id.* at 27a.

[177] *Donegal Mut. Ins. Co.*, 938 A.2d at 293–94.

[178] *Superior Well Servs., Inc.*, 2022 WL 884694, at *10 (citing *Liberty Mut. Ins. Co. v. Treesdale, Inc*., 418 F.3d 330, 336 (3d Cir. 2005) and *Flemming ex rel. Estate of Flemming v. Air Sunshine, Inc*., 311 F.3d 282, 295 (3d Cir. 2002) (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co*., 676 F.2d 56, 61 (3d Cir. 1982)).

[179] *Fed. Ins. Co. v. Dentsply Int'l Inc.*, No. 06-991, 2007 WL 4150664, at *3 (M.D. Pa. Nov. 19, 2007) (citing *Treesdale, Inc*., 418 F.3d at 336).

[180] *See Legionella (Legionnaires' Disease and Pontiac Fever): History, Burden, and Trends*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/legionella/about/history.html (last visited Nov. 15, 2022); *How a hotel convention became ground zero for this deadly bacteria*, PBS NEWS (Jul. 23, 2018), https://www.pbs.org/newshour/health/how-a-hotel-convention-became-ground-zero-for-this deadly-bacteria.

[181] *See Still Disinfecting Surfaces? It Might Not Be Worth It*, NPR (Dec. 28, 2020), https://www.npr.org/sections/health-shots/2020/12/28/948936133/still-disinfecting-surfaces-it-might-not-be-worth-it; *Types of Masks and Respirators*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Sept. 8, 2022), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html; Our Early Confusion About Airborne COVID-19 Transmission Still Haunts Us, TIME (Mar. 29, 2022), https://time.com/6162065/covid-19-airborne-transmission-confusion/.

[182] *Donegal Mut. Ins. Co.*, 938 A.2d at 293. The policy provides: "All 'bodily injury' and 'property damage' resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one 'occurrence.'" *Id.* at 289. An "occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in . . . [b]odily injury or [p]roperty damage." *Id.*

[183] *Id.* at 295.

[184] *Id.*

[185] *Sunoco, Inc. v. Illinois Nat. Ins. Co.,* 226 F. App'x 104, 107 (3d Cir. 2007).

[186] *Treesdale, Inc*., 418 F.3d at 339. The policy states: "[a]ll personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered as the result of one and the same occurrence." *Id.* at 333.

[187] *Id.* at 334–339.

[188] *Sunoco, Inc.,* 226 F. App'x at 108.

[189] *Id.*

[190] *Appalachian Ins. Co.*, 676 F.2d at 58.

---

[191] *Id.* at 58–59.

[192] *Id.* at 61–63.

[193] *Id.*

[194] *Id.* at 61.

[195] *Flemming*, 311 F.3d at 284. The policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period neither expected or intended from the standpoint of the Insured[.]" *Id.* at 287.

[196] *Id.* at 284.

[197] *Id.* at 287.

[198] *Id.* at 286.

[199] *Id.* at 295 (internal citations omitted).

[200] *Superior Well Servs., Inc.*, 2022 WL 884694, at *10 (appeal filed).

[201] *Id.* The parties are presently on appeal. *See Am. Home Assurance Co. v. Superior Well Servs., Inc.,* Docket No. 22-1498 (3d Cir. March 25, 2022). The central issues appear to be whether there is an occurrence at all; National Fire and Genesis concede a health care event.

[202] *Busby v. Steadfast Ins. Co.*, 420 F. Supp. 3d 289, 294 (E.D. Pa. 2019).

[203] *Id.*

[204] *Cincinnati Ins. Co. v. Devon Int'l, Inc.*, 924 F. Supp. 2d 587, 592 (E.D. Pa. 2013) ("If all the claims against [insured] 'stem from one proximate cause,' . . . and [the insured] 'had some control' over that cause . . . then there is a single occurrence.").

[205] J.A. 153a–154a.

[206] *Superior Well Servs., Inc*, 2022 WL 884694, at *10.

[207] *Busby,* 420 F. Supp. 3d at 294.

[208] *Donegal*, 938 A.2d at 293.

[209] *Id.* at 295.

[210] *Appalachian Ins. Co.*, 676 F.2d at 61–63.

[211] J.A. 1095a–1106a.

[212] *Id*. at 1006a–1046a.

[213] *Id*. at 252a–277a, 281a–304a, 360a–400a, 407a–429a, 540a–576a.

[214] *Flemming*, 311 F.3d at 295 (internal citations omitted).

[215] J.A. 968a–983a.

[216] *Id*. at 446a–454a.

[217] ECF Doc. No. 86-2 at 23, n.9. For example, the seven underlying lawsuits alleging COVID-related injuries at the Milford Center in Delaware arguably arise from a single health care event.

[218] ECF Doc. No. 88-1 at 19–24.

[219] J.A. 1183a.

[220] *Id*. at 1192a.

[221] ECF Doc. No. 88-1 at 19–20.

[222] J.A. 1226a–1227a.

[223] ECF Doc. No. 88-1 at 22.

[224] *J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.*, A.2d 672, 684 (Pa. Super. Ct. 2002).

[225] *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 561 F. Supp. 3d 467, 480 (M.D. Pa. 2021), *reconsideration denied*, No. 21-00658, 2022 WL 178816 (M.D. Pa. Jan. 18, 2022) (citing *Allegheny Clinic v. Total Wellness Psychiatry, PLLC*, No. 19-00517, 2021 WL 2317415, at *5 (W.D. Pa. June 7, 2021) ("[T]he express terms of the Agreement are to be given greater weight than course of performance."); *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, No. 84-6179, 1986 WL 10547, at *3 (E.D. Pa. Sept. 17, 1986) (noting that when parties have erroneously performed in a way that contradicts the plain language of the contract, "the court should not perpetuate the error.")).

[226] *Riethman v. Berry*, 287 F.3d 274, 277 (3d Cir. 2002) (quoting Restatement (Second) of Contracts § 203(b) (1981)).

[227] Genesis does not appear to argue National Fire is estopped from representing all COVID-19 claims are subject to one self-insured retention. But this claim fails even if Genesis did. "A party may not use estoppel to enforce a contractual promise . . . estoppel is only a contract 'substitute' for when 'the formal requirements of contract formation have not been satisfied.'" *Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 499 (3d Cir. 2021), *as revised* (Mar. 25, 2021). To make a claim for promissory estoppel, Genesis must show: (1) National Fire made a promise it should have reasonably expected to induce action or forbearance on the part of the Genesis; (2) Genesis actually took action or refrained from taking action in reliance on the promise; and (3)

injustice can be avoided only by enforcing the promise. *Edwards v. Wyatt*, 335 F.3d 261, 277 (3d Cir. 2003). We have no facts showing Genesis acted or refrained from acting in reliance on National Fire's initial representation a single $3 million self-insured retention applied to the COVID claims.

Genesis also does not, and cannot, claim equitable estoppel as a defense. The doctrine of estoppel recognizes an informal promise implied by one's words, deeds, or representations, which leads another to rely justifiably on the words, deeds, or representation may be enforced in equity. *See Liberty Prop. Tr. v. Day-Timers, Inc.,* 815 A.2d 1045, 1050 (Pa. Super. Ct. 2003); *Naylor v. Bd. of Supervisors of Charlestown Twp.*, 253 A.3d 786, 814 (Pa. Commw. Ct.). The two essential elements of equitable estoppel are inducement and justifiable reliance on the inducement. *Liberty Prop. Tr.*, 815 A.2d at 1050. Genesis adduced no evidence of relying on National Fire's initial representation to its detriment.

[228] ECF Doc. No. 88-1 at 19–24.

[229] J.A. 1234a.

[230] ECF Doc. No. 88-1 at 26–29.

[231] ECF Doc. No. 86.

[232] ECF Doc. No. 85 at 29–30.

[233] But injuries to multiple resident as the same location during a COVID-19 outbreak can be considered the same health care event. So notice of a potential COVID-19 lawsuit or claim arising out of, or in connection with the same facility would be a single "health care event" and will be deemed to have been made on the date the first claim is made against Genesis, or the date Genesis discovers the first potential claim.

[234] J.A. 45a.

[235] *Id*. at 28a (emphasis added)

[236] *Id*. at 1172a.

[237] *Pittsburgh Mack Sales & Serv., Inc.*, 580 F.3d at 190.

[238] *Cabot Oil & Gas Corp.*, 698 F. Supp. 2d at 476 (quoting *Wilton*, 515 U.S. at 282). There is a "considerable amount of discretion built into the Declaratory Judgment Act itself. Even when declaratory actions are ripe, the Act only gives a court the power to make a declaration regarding 'the rights and other legal relations of any interested party seeking such declaration,' . . . it does not require that the court exercise that power." *Step-Saver Data Sys., Inc*., 912 F.2d at 646–47. "Since the language of the Declaratory Judgment Act is permissive rather than mandatory, the court is not required to enter declarations clarifying the respective rights and obligations of the parties." *Air & Liquid Sys. Corp.*, 2013 WL 5436934, at *9 (citing *MedImmune, Inc.*, 549 U.S. at 136–37).

---

[239] J.A. 185a–186a.